THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRANCE SUTTON, Defendant-Appellant.

First District (1st Division) No. 1—98—0643

Opinion filed September 29, 2000.

Rita A. Fry, Public Defender, of Chicago (Tim Leeming, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Eileen O'Neill, and JoAnne M. Rogers, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

A jury found Terrance Sutton guilty of first degree murder (720 ILCS 5/9—1(a)(1) (West 1996)) for the stabbing death of Tiffany Hankins. Defendant alleges: (1) the trial court erroneously allowed the State to cross-examine defendant with statements defendant made to a nontestifying psychiatrist during a fitness and sanity examination; (2) the State improperly impeached defendant with evidence of a prior act of domestic violence committed by defendant against the victim;

(3) the State's closing argument denied defendant a fair trial; and (4) defendant's 100-year sentence was excessive. Whether the court, relying on the homicide exception to the physician-patient privilege, properly allowed the State to cross-examine defendant with statements defendant made to a nontestifying psychiatrist during a fitness and sanity examination when the defendant did not raise an insanity defense is a question of first impression. Resolution of this question requires us to examine the competing and sometimes conflicting provisions regarding the admissibility of statements of a defendant under the homicide exception to the physician-patient privilege, the fitness statute and the attorney-client privilege. We find the trial court abused its discretion in allowing the State to cross-examine defendant with statements made by defendant to a nontestifying psychiatrist during a fitness and sanity examination where no insanity defense was raised. We reverse and remand for a new trial.

## TRIAL TESTIMONY

The trial testimony established that in October 1995 Tiffany and her three children moved into an apartment with defendant. Defendant quit his job and began selling drugs. Tiffany and defendant argued about his drug dealing. In January 1996, Tiffany and her children moved in with Tiffany's mother, Marcia Jacobs. Tiffany gave birth to a baby boy, Malcolm, in March 1996. On April 25, 1996, defendant visited Tiffany at her mother's house, they argued and defendant stabbed Tiffany repeatedly. Assistant State's Attorney McLaughlin testified that she interviewed defendant after his arrest on June 10, 1996. After advising defendant of his *Miranda* warnings, the defendant agreed to answer questions and McLaughlin wrote out a six-page statement. Defendant reviewed it, made corrections and then signed the statement.

Defendant's statement indicated that on April 25, 1996, he went to see Tiffany. Defendant, Tiffany, and the baby, Malcolm, went into the basement of the house. After Tiffany and defendant talked awhile, Tiffany went upstairs and returned to the basement with a steak knife. Defendant stated that they began to argue. Tiffany got a skate. Defendant stated that he knew that she was not going to hit him with the skate because "she would never do that." Defendant's statement indicated that defendant was angry and he "stuck the knife into Tiffany's side." He did not remember how many times he stabbed her. Tiffany fell to the floor, told him that she loved him and asked him to put their baby in her arms. He brought Tiffany the baby, and then she told defendant to leave before the police arrived. Defendant stated that he dropped the blade of the knife into the toy box. Defendant's

statement indicated: "Since I did this, I have just been waiting to get caught."

Dr. Larry Sims, a forensic pathologist, testified that multiple stab wounds caused the victim's death. On cross-examination, Dr. Sims testified that the hemorrhaging under the victim's fingernails was possibly consistent with the victim holding on to a roller skate very tightly. He did not know whether the victim was the aggressor.

Defendant testified that, to support Tiffany and her three children, he began selling drugs. He and Tiffany argued about his drug dealing. He testified that he could not afford to stop selling drugs because he and Tiffany "had a baby on the way, [and] three other little kids in the house." After Tiffany and her three children moved out in January 1996, defendant testified that he continued to see her at her mother's house "two or three times a week." Defendant testified that when he arrived at the house on April 25, 1996, he and the victim talked briefly in the basement. Defendant said that, while he held Malcolm, the victim again went upstairs and returned with a "steak knife." Tiffany asked defendant when they were going to get an apartment. When defendant replied they would get an apartment as soon as they saved some money, Tiffany got mad and an argument followed.

Defendant testified that, as their argument continued, Tiffany grabbed a roller skate. She began approaching defendant with the roller skate while she informed him that Malcolm might not be his son. Tiffany began swinging the roller skate at him. Defendant said that he picked up the knife in order to defend himself. After Tiffany hit defendant with the roller skate, defendant testified that he "started lashing out" with the knife to defend himself from the roller skate. Defendant testified that once the victim fell to the floor, he stopped. She told defendant that she loved him and asked him to bring Malcolm to her. Defendant placed the baby in her arms, took a bicycle and rode off. When asked if he left the victim to die defendant responded, "I didn't know she was going to die. I didn't know she was hurt that bad."

On cross-examination, defendant testified that he did not intend to kill the victim. Defendant stated that the victim had hit him with a roller skate before he retaliated in self-defense. He denied telling the assistant State's Attorney that he knew the victim would not hit him with the skate. Over defense counsel's objection, the State cross-examined defendant with statements defendant made to psychiatrist Dr. Conroe, that the fight with Tiffany only involved fists. The State questioned defendant as to whether he told Dr. Conroe that Tiffany attacked him with a skate and impeached him with the fact that he never mentioned the skate to Dr. Conroe.

# ANALYSIS

## I. CROSS-EXAMINATION OF DEFENDANT WITH STATEMENTS MADE TO NONTESTIFYING PSYCHIATRIST DURING FITNESS AND SANITY EXAMINATION

We first address whether the State can use statements made by defendant to a nontestifying psychiatrist, Dr. Conroe, during a fitness and sanity examination to cross-examine defendant. Neither the State nor the defense called Dr. Conroe as a witness. The admissibility of evidence at trial is within the sound discretion of the trial court and its determination will not be overturned absent an abuse of discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Defendant contends that the trial court erroneously permitted the State to cross-examine him with statements he made to the psychiatrist, Dr. Conroe, during an examination to determine defendant's fitness and sanity for trial. During cross-examination, the State questioned defendant about his failure to tell Dr. Conroe that the victim attacked him with a roller skate before he retaliated in self-defense and the State further elicited the fact that the defendant told Dr. Conroe that the fight involved only fists. Defendant argues that these statements are confidential and privileged since the purpose of the examination of defendant by Dr. Conroe was to determine fitness and sanity. 725 ILCS 5/104—14 (West 1992).

The State argues the statements made by the defendant were not confidential and not privileged, but admissions, properly received in evidence as exceptions to the hearsay rule. The trial court in allowing the State to cross-examine defendant with these statements relied on the homicide exception to the physician-patient privilege. 735 ILCS 5/8—802(1) (West 1998). The State contends the defendant's statements to the psychiatrist relate directly to the immediate circumstances of the homicide and that the homicide exception to the physician-patient privilege applies.

### A. Application of Homicide Exception to Physician-Patient Privilege to Statements Made by Defendant During Fitness and Sanity Examination

■ The purpose of the physician-patient privilege is to encourage full disclosure in order to ensure the best diagnosis and treatment for the patient. *People v. Wilber*, 279 Ill. App. 3d 462 (1996). The patient has an interest, recognized by the legislature, in maintaining confidentiality in his medical dealings with a physician. *People v. Florendo*, 95 Ill. 2d 155 (1983). Under the statutory physician-patient privilege, no physician shall be permitted to disclose any information he may have acquired in attending any patient in a professional

character, necessary to enable him professionally to serve such patient, unless statutory exceptions apply. *People v. Ekong*, 221 Ill. App. 3d 559 (1991). Our legislature, by enacting the physician-patient section of the Code of Civil Procedure, established a general prohibition against a physician's disclosure of privileged patient information with certain exceptions. 735 ILCS 5/8—802 (West 1992). The homicide exception to the physician-patient privilege is at issue in this case and states, in relevant part, as follows:

"No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient, except only (1) in trials for homicide when the disclosure relates directly to the fact or immediate circumstances of the homicide ***." 735 ILCS 5/8—802 (West 1992).

■ While the physician-patient section of the Code of Civil Procedure addresses the disclosure of information acquired by a physician in attending a patient, it does not address the issue of disclosure when a physician conducts an examination of a defendant for determining fitness and sanity in the context of a criminal trial. The statute that does address admissibility of physician-patient communications that occur during fitness examinations is section 104—14 of the Code of Criminal Procedure of 1963, "Use of Statements Made During Examination or Treatment" (725 ILCS 5/104—14 (West 1992)). By enacting section 104—14 of the Code of Criminal Procedure, the legislature prohibits the admission against the defendant of statements made by defendant during fitness and sanity examinations unless defendant raises the defense of insanity or a drugged or intoxicated condition. The pertinent language in part is as follows:

"(a) Statements made by the defendant and information gathered in the course of any examination or treatment ordered under Section 104—13 *** shall not be admissible against the defendant unless he raises the defense of insanity or the defense of drugged or intoxicated condition, in which case they shall be admissible only on the issue of whether he was insane, drugged or intoxicated. ***

(b) Except as provided in paragraph (a) of this Section, no statement made by the defendant in the course of any examination or treatment ordered under Section 104—13 *** which relates to the crime charged or to other criminal acts shall be disclosed by persons conducting the examination or the treatment, except to members of the examining or treating team, without the informed written consent of the defendant. ***

(c) The court shall advise the defendant of the limitations on the use of any statements made or information gathered in the course of the fitness examination ***." 725 ILCS 5/104—14(a), (b), (c) (West 1992).

In this case, the trial court recognized that the initial reason for the fitness and sanity examination was for a possible psychiatric defense. However, the trial court concluded that because defendant discussed with Dr. Conroe certain circumstances that led up to the homicide, those statements would be admissible. The defense objected to the State's possession and use of the statements contained in Dr. Conroe's report that were made by the defendant to Dr. Conroe during the fitness and sanity examination, because, the defense argued, the statements were privileged and not admissible since no insanity defense was raised:

"DEFENSE COUNSEL: I would also suggest that, one, it is covered by the privilege and the privilege keeps it from being tendered because the majority of the reasons for the interview of Mr. Sutton was for his fitness and his sanity, period. Fitness and sanity. The defense is not raised, the insanity defense is not raised, it is not being raised at this time.

\* \* \*

PROSECUTOR: I don't have a copy of the subpoena in the file, but my records indicate that I did subpoena it and I received it pursuant to subpoena. \*\*\* They're trying to say there is a privilege even though it says there is no privilege \*\*\*.

\* \* \*

DEFENSE COUNSEL: As far as the subpoena is concerned, obviously, Dr. Conroe's interview of Mr. Sutton is privileged and, again, I spoke with the doctor this morning, he said that he did not tender the report.

\* \* \*

THE COURT: The road is clear, set out in 735 Illinois Compiled Statutes, 5/8—802, Physician and patient: No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in any professional character necessary to enabling him or her professionally to serve the patient except only, one, the trial for homicide where the disclosure relates directly to the fact or immediate circumstances of the homicide.

Now in this particular statement, yes, he was examined by a doctor. The plan probably was for a possible psychiatric defense. However, nevertheless, during that particular statement he did indicate certain circumstances that lead up to the homicide, itself, and this privilege was not designed to hamper homicide investigation, it was specifically designed to permit defendants to speak freely to the patient, to speak freely to physicians, but there is the homicide exception.

The Court is of the opinion the homicide exception applies in this particular case, therefore, I will allow only the part of the state-

ment that relates to the homicide, not his whole background ***
but to the statement regarding what lead up to the homicide, the
Court is of the opinion would fall into the exception and, therefore,
I will allow that part and that part only.

DEFENSE COUNSEL: Are you allowing the State to introduce
the report?

THE COURT: No, not the report. The doctor's testimony regard-
ing the events of April 26th of 1996, and I believe that is on Page 2
about the third paragraph.

DEFENSE COUNSEL: I understand that, but you are saying
they can call the doctor to testify regarding that particular
paragraph?

THE COURT: That particular paragraph, those two paragraphs
right there. Both sides understand my ruling?

PROSECUTOR: Yes.

THE COURT: I think that would be in conformance with the
exception.

DEFENSE COUNSEL: I understand, Judge. Obviously our objec-
tion is noted for the record."

The trial court believed that the homicide exception to the
physician-patient privilege allowed the prosecution to use the state-
ments defendant made to Dr. Conroe even though defendant's state-
ments were made during Dr. Conroe's examination to determine
defendant's fitness and sanity. We note that during the trial the infor-
mation from Dr. Conroe's report was not introduced by the State by
calling Dr. Conroe as a witness, but rather the trial court allowed the
State to cross-examine defendant with the statements defendant made
to Dr. Conroe, as noted in his report, during his fitness and sanity ex-
amination of defendant. In *People v. Doe*, 211 Ill. App. 3d 962 (1991),
the court defined the parameters of the homicide exception to the
physician-patient privilege. In *Doe*, a grand jury subpoena was issued
to a therapist of a housing corporation which called for "any and all
information on all male tenants of 7720, Inc." *Doe*, 211 Ill. App. 3d at
964. The issue was whether the information requested in the subpoena
could be disclosed under the homicide exception. The court did not ap-
ply the homicide exception in *Doe*, noting that the legislature
intentionally included the words "directly" and "immediate" in the
exception. There must be a showing that the disclosure *directly* relates
to the *immediate* circumstances of the homicide and the State failed to
make such a showing. *Doe*, 211 Ill. App. 3d at 968. Therefore, the
court held the order denying the motion to quash the subpoena *duces
tecum* was improper because "a showing that the disclosure merely re-
lates to the *circumstances* of a homicide is not sufficient to invoke the
exception." (Emphasis added.) *Doe*, 211 Ill. App. 3d at 967.

In *People v. Wilson*, 164 Ill. 2d 436 (1994), the court applied the *Doe* interpretation of the homicide exception. The defendant sought to preclude the use of statements he made to a therapist by arguing that the statements he made did not relate "directly" to the facts of the homicide. In *Wilson*, the therapist visited the defendant in jail in order to assess whether defendant was suicidal. The therapist suggested to the defendant that he write a journal about his thoughts as a way to relieve stress. Over time, the defendant shared parts of that journal with the therapist and told the therapist that people could tell that he "did it." The court held that statements which the defendant made to the therapist fell within the homicide exception and were admissible since the statements referred directly to the facts of the homicide. *Wilson*, 164 Ill. 2d at 456.

We conclude the statements made by the defendant to Dr. Conroe and elicited by the prosecution during cross-examination of the defendant directly relate to the facts or immediate circumstances of the homicide. However, the situation contemplated by the homicide exception is application to statements made by the defendant in the context of professional services rendered by physicians that are unrelated to fitness or sanity examinations. Such was the case in *Wilson*, where the therapist met with the defendant to ascertain whether he had any suicidal tendencies, not to determine his fitness or sanity. We note the homicide exception to the physician-patient privilege also applies in reckless homicide cases (*People v. Hart*, 194 Ill. App. 3d 997, 1003 (1990)) and in prosecutions where the written results of blood-alcohol tests are admissible (*People v. Bates*, 169 Ill. App. 3d 218, 225 (1988)). However, these cases do not address application of the homicide exception to statements made by a criminal defendant during the course of a fitness and sanity examination to the doctor conducting that examination.

■ The trial court believed that the homicide exception applied even though the initial examination was to determine defendant's fitness and sanity. We note that, under the facts of this case, defendant would not have had any contact with Dr. Conroe except as to determine his fitness and sanity as these issues related to the criminal charges pending against him and as these issues related to his defense to those criminal charges. Therefore, the statements made by defendant during the examination fell within the terms of section 104—14 of the Code of Criminal Procedure, "Use of Statements Made During Examination or Treatment" (725 ILCS 5/104—14 (West 1992)).

We are mindful of the fact that the State can, under certain circumstances, cross-examine the defendant with statements made during a fitness examination pursuant to section 104—14. Use of these

statements, however, is limited to specific situations. In *People v. Kashney*, 111 Ill. 2d 454, 461 (1986) (consolidated with *People v. Lee*), our supreme court held that it was not error for the trial court to allow the State to impeach the defendant by questioning him about statements he made to psychiatrists who examined him for fitness. The defendant claimed he was coerced into confessing by demons that possessed one of the officers who questioned him. Defendant argued that the explanation for his false confession did not raise the affirmative defense of insanity and therefore section 104—14 prohibited the State from using statements he made during his fitness examinations. The supreme court noted that defendant introduced the substance of statements he made during his fitness examination and "waived whatever protection might be afforded by [section 104—14(a)] by calling the court-appointed psychiatrists to testify in support of his claim that his confession was coerced by alleged demonic possession." *Kashney*, 111 Ill. 2d at 461. In this case, however, defendant did not call the psychiatrist to testify in his defense, did not introduce the substance of statements he made to Dr. Conroe and, therefore, unlike *Kashney*, did not waive the protection afforded by section 104—14(a) to the statements he made to the psychiatrist, Dr. Conroe.

In *Kashney*, defendant Lee was initially interviewed at the court's direction by a psychologist after he indicated that he might raise an insanity defense. At trial, however, the defendant did not raise the insanity defense. Instead, a psychiatrist was called to testify that the defendant suffered from posttraumatic stress syndrome. In rebuttal, the State called the psychologist who interviewed defendant and elicited incriminating statements made by the defendant. Our supreme court found that because defendant did not raise the defense of insanity, the prosecution "was barred by the exclusionary language of section 104—14(a) from calling the court-appointed psychologist and eliciting from her statements made by the defendant during the examination." *Kashney*, 111 Ill. 2d at 465. Here, like Lee, defendant did not raise the defense of insanity even though he was initially examined by Dr. Conroe to determine his fitness and sanity. Rather, defendant testified that he acted in self-defense when the victim attacked him. Therefore, because defendant did not present an insanity defense, any statements he made to Dr. Conroe during a fitness examination are barred by the exclusionary language of section 104—14(a), which specifically provides that: "Statements made by the defendant *** in the course of any examination *** ordered under section 104—13 *** shall not be admissible against the defendant unless he raises the defense of insanity ***." 725 ILCS 5/104—14(a) (West 1992).

We note that the due process clause of the fourteenth amendment

prohibits the prosecution of a person who is unfit to stand trial. U.S. Const., amend. XIV; *Medina v. California*, 505 U.S. 437, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992); *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991). As such, section 104—14 was enacted to protect the integrity of the criminal process by establishing a defendant's fitness before any trial process begins where fitness to stand trial may be an issue. Section 104—14 was not designed as an investigative tool to further criminal prosecution by providing information, incriminating or otherwise, to be used against a defendant who is being examined by a psychiatrist to resolve fitness or sanity issues. Section 104—14 is particularly designed to be used with criminal defendants. Our supreme court has held that where there are two statutory provisions, one of which is designed to apply to cases generally, and the other which is particular, the particular provision must prevail. *Hernon v. E.W. Corrigan Construction Co.*, 149 Ill. 2d 190, 195 (1992). Under the facts of this case, to the extent that the admissibility provision of section 104—14(a) of the Code of Criminal Procedure and the homicide exception to the physician-patient privilege under section 8—802 of the Code of Civil Procedure are in conflict, we conclude that the more specific and detailed fitness scheme particularly designed for criminal cases where fitness and sanity issues are raised is controlling. Section 104—14(a) prohibits the State from cross-examining defendant with statements he made to Dr. Conroe during a fitness and sanity examination where the defense of insanity is not raised.

### B. Application of Attorney-Client Privilege to Communications by Defendant to Nontestifying Psychiatrist Who Examined Defendant for Fitness and Sanity

In *People v. Knuckles*, 165 Ill. 2d 125 (1995), the supreme court addressed the issue of whether the attorney-client privilege applies to communications between a defendant who raises an insanity defense and a nontestifying psychiatrist who examines the accused at the request of defense counsel to aid in the preparation of the defense. Although the court in *Knuckles* addressed the attorney-client privilege, not the application of the homicide exception to the physician-patient privilege, we find the case instructive. *Knuckles* involved facts similar to the present case where the defendant was interviewed by a psychiatrist in order to assist the public defender in preparing a possible defense. However, the psychiatrist never testified for the defense at any court proceeding and the defense did not include the psychiatrist on its list of witnesses for trial. The defense relied on two defenses: insanity and self-defense. The State subpoenaed the psychiatrist to testify at trial and subpoenaed the notes taken during the psychiatrist's

interview with the defendant. The trial court quashed the subpoenas and held that "a psychiatrist hired by defense counsel to examine the client for purposes of trial preparation is an agent of defense counsel and therefore the communications between the defendant and the defense-retained psychiatrist are protected by the attorney-client privilege. *** [T]he privilege is not waived by the assertion of the insanity defense; the State is not allowed to discover or elicit the opinions and notes of the defense psychiatrist unless the psychiatrist testifies at trial." *Knuckles*, 165 Ill. 2d at 129. The appellate court affirmed the trial court's ruling.

■ The supreme court noted the tension between two competing policies: "one that favors the broad discovery of relevant information and another that guards the narrow discovery exemptions, based on privilege, which are deeply rooted in the common law and the Federal and State Constitutions." *Knuckles*, 165 Ill. 2d at 129. The court recognized that the policies underlying the attorney-client privilege exist apart from and run counter to the primary goals of discovery. The supreme court cited to cases in Illinois which recognize that the "*raison d'etre* of the privilege is to secure for the client the ability to confide freely and fully in his or her attorney, without fear that confidential information will be disseminated to others" (165 Ill. 2d at 130). *People v. Adam*, 51 Ill. 2d 46, 48 (1972) (client's communications are protected from disclosure unless the privilege is waived); *People v. Knippenberg*, 66 Ill. 2d 276 (1977) (privilege applies to communications made to defense lawyer's investigator.)

■ The supreme court in affirming the trial and appellate courts noted that, in many cases, the exploration of all possible defenses will require the assistance of a psychiatric expert. *Knuckles*, 165 Ill. 2d at 130. The court acknowledged that such an expert who is retained by the defense is not actually an employee of that attorney in the same sense as a typist or a law clerk. *Knuckles*, 165 Ill. 2d at 130. However, the court also explained that psychiatric assistance is often critical to the attorney's ability to present a defense. *Knuckles*, 165 Ill. 2d at 130-31. The court noted that most courts presented with this issue have applied the attorney-client privilege to statements defendants make to psychiatric experts retained by their attorneys to aid in preparation of the defense. *Knuckles*, 165 Ill. 2d at 133. Thus, the court concluded that, despite the relevance of the evidence, the attorney-client privilege applies to communications between the defense and nontestifying mental health experts. *Knuckles*, 165 Ill. 2d at 130. The court further pointed out that if it were to accept the argument that the relevance of the evidence justified its admission, notwithstanding the attorney-client privilege, no claim of privilege could ever prevail because the exception would devour the rule:

"[W]e hold that the attorney-client privilege applies to communications between the defense and nontestifying mental health experts retained by the defense to probe the defendant's mental condition in anticipation of relevant defenses. We further hold that the privilege is not waived merely by the assertion of defenses which place the defendant's mental condition in issue. Finally, we decline to adopt a generalized public interest exception in the case at bar to allow the State's interest in gathering evidence to overcome the attorney-client privilege." *Knuckles*, 165 Ill. 2d at 145.

The question resolved by the *Knuckles* court was whether communications by defendant made to an expert witness, such as a psychiatrist, whose engagement by the defense is necessary to the preparation of an insanity defense, are protected by the attorney-client privilege. *Knuckles*, 165 Ill. 2d at 130. Here, as in *Knuckles*, defendant was referred to a psychiatrist for the purpose of exploring a possible insanity defense and to address fitness. Further, similar to *Knuckles*, the record reflects that the defense did not include Dr. Conroe on its list of witnesses to be called. In *Knuckles*, even though an insanity defense was to be presented, the supreme court found that the attorney-client privilege applied to communications between the defendant and nontestifying mental health experts. *Knuckles*, 165 Ill. 2d at 130. The court made it clear that "the privilege is waived only with respect to the testimony and reports of those experts who are identified by the defense as witnesses who will be called to testify on behalf of the defendant at trial, or whose notes and reports are used by other defense experts who testify." *Knuckles*, 165 Ill. 2d at 139.

Here, application of the privilege is even more justified because although defendant was referred to Dr. Conroe for purposes of the defense exploring the possibility of an insanity defense, unlike *Knuckles*, no insanity defense was ever presented. Dr. Conroe was not identified by the defense as a witness, the defense never called Dr. Conroe as a witness, and his notes and reports were in no way used by any other defense experts or defense witnesses. Therefore, under the facts of this case, applying the *Knuckles* analysis, the State's use of the defendant's statements to Dr. Conroe violated the attorney-client privilege since the statements were made by defendant to a nontestifying mental health expert during an examination to determine defendant's fitness and sanity.

We are mindful of the public interest in the truth-finding process. In this case, where the State's ability to prove defendant guilty beyond a reasonable doubt will in no way be hampered by the State being prohibited from cross-examining defendant with statements he made

to Dr. Conroe, a nontestifying defense witness, we find no reason for the attorney-client privilege to yield to the public interest in the truth-finding process. There is nothing in this record to indicate that application of the attorney-client privilege, thereby excluding the State from cross-examining defendant with statements he made to Dr. Conroe, will deprive the trier of fact of valuable evidence so as to undermine the public interest in the administration of justice. We decline to adopt a generalized public interest exception under the facts of this case to allow the State's interest in using the defendant's statements to overcome the attorney-client privilege.

Finally, extending the homicide exception to the facts of this case and allowing it to trump the confidentiality provided by the fitness statute and the protection afforded by the attorney-client privilege would create an unsolvable dilemma for defense counsel by placing the right to effective counsel at odds with fitness and sanity examinations. Defense counsel who decided to pursue the possibility of an insanity defense could expose his client to the risk of providing incriminating information to the prosecution and thereby violate his client's sixth amendment right to the effective assistance of counsel. In *Knuckles* the supreme court noted that the essence of the sixth amendment right to counsel is privacy of communication with counsel and found no reason to depart from that view. *Knuckles*, 165 Ill. 2d at 137. The "centrality of open client and attorney communication to the proper functioning of our adversary system of justice" mandates application of the attorney-client privilege. *United States v. Zolin*, 491 U.S. 554, 562, 105 L. Ed. 2d 469, 485, 109 S. Ct. 2619, 2626 (1989). While the attorney client privilege is not given express constitutional protection, it is inextricably related to the right to counsel under the sixth amendment.

The supreme court recognized the importance of the relationship between the sixth amendment right to counsel and the attorney-client privilege in *People v. Knippenberg*, 66 Ill. 2d 276, 285 (1977). In *Knippenberg*, a communication by the defendant to a defense investigator was used at trial by the prosecution to impeach the defendant. The court emphasized that lawyers have a duty to fully investigate their clients' cases and held that an investigator's interview with the client, at the request of defense counsel, is protected by the attorney-client privilege. *Knippenberg*, 66 Ill. 2d at 284. The supreme court concluded that the use of the communication by the State to impeach the defendant was "prejudicial error of an intolerable character and violated the defendant's constitutional assurance of the effective assistance of counsel under the sixth amendment and to a fair trial under the due process clause of the fourteenth amendment." *Knippenberg*, 66 Ill. 2d

at 284. Here, the statements of the defendant made to the nontestifying psychiatrist during an examination for fitness and sanity are protected by the attorney-client privilege, which is inextricably related to the defendant's sixth amendment right to counsel.

■ We conclude the statements made by defendant to Dr. Conroe, a nontestifying psychiatrist, during the defendant's examination for fitness and sanity may not be used by the State to cross-examine defendant as admissions against interest or as impeachment under the homicide exception to the physician-patient privilege because the plain language of section 104—14(a) prohibits the statements made by defendant to Dr. Conroe from being admitted against the defendant. 725 ILCS 5/104—14(a) (West 1992). The exception to the use of such statements as provided by section 104—14 does not apply here as the defense of insanity or drugged or intoxicated condition was not raised. 725 ILCS 5/104—14(b) (West 1992). Moreover, under the holding in *Knuckles*, the cross-examination of defendant with statements he made to a nontestifying psychiatrist during a fitness and sanity examination was a violation of the attorney-client privilege. *Knuckles*, 165 Ill. 2d at 130. Under *Knippenberg*, the cross-examination of defendant with statements he made to a nontestifying psychiatrist during a fitness and sanity examination was a violation of defendant's constitutional assurance of the effective assistance of counsel under the sixth amendment and to a fair trial under the due process clause of the fourteenth amendment. Here, where no insanity defense was raised, Dr. Conroe was not called as a defense witness, and Dr. Conroe's notes were not used by any defense witness, the trial court abused its discretion by allowing the State to cross-examine defendant with statements made by defendant to Dr. Conroe during a fitness and sanity examination. Such cross-examination will not be allowed on retrial. The prosecution is also prohibited from making any reference in closing argument regarding defendant's statements to Dr. Conroe in which he failed to mention the skate and in which he described the fight with the victim as involving only fists.

## II. PRIOR BAD ACTS

Defendant contends that the trial court erred in allowing the State to impeach his testimony with evidence that he allegedly battered the victim three months prior to killing her. In a pretrial motion, the State argued that the prior domestic violence was admissible to show defendant's antagonistic and hostile nature as well as his intent to kill or do great bodily harm to the victim. In addressing the defense objection, the trial court stated:

"The State wants to introduce testimony that some three months

prior to the murder, the victim's mother arrived at the victim's home and observed bruises upon the victim's face, and how the victim had told the mother how she received those bruises and how a complaint was filed and the emergency order of protection was obtained. \*\*\* [E]vidence would be hearsay and not be allowed in the State's case in chief. However, the court is of the opinion it would be probative for impeachment purposes if there was a defense of self defense, or for some other reason, to show the bad attitude towards the victim in this particular case. \*\*\* So again, that evidence may be relevant and reliable again in impeachment, but not in the State's case in chief."

During direct examination, the defense attorney asked defendant why the victim moved out of defendant's home. Defendant responded, "[B]ecause I was selling drugs and arguments and things like that." Defendant failed to mention the additional fact that the victim moved out as the result of physical violence. The State on cross-examination asked defendant: "The reason [the victim] moved out is because you were abusive?" Defense objected. The State responded that the defense opened the door to the prior abuse, which was one of the reasons why the victim moved out, and defendant's answer was incomplete and only half true. The trial court agreed and ruled that the evidence of defendant's prior abuse was admissible to contradict and impeach defendant's testimony on direct examination.

The State then continued with questions about the prior abuse as follows:

"THE STATE: And that is when Tiffany's mother, Marcia Jacobs, came over and moved Tiffany out of that apartment, correct?

DEFENDANT: No

THE STATE: The fact of the matter is, when Marcia came over, she moved Tiffany out of that apartment and brought her back home to Riverdale to be away from you, isn't it?

DEFENDANT: Yes.

THE STATE: So this had nothing to do with Tiffany being upset with you about your drug dealing?

DEFENDANT: Yes, it started.

THE STATE: What this had everything to do with is her physical safety, correct?"

Defendant argues that the trial court should have allowed this cross-examination only if defendant claimed on direct examination that he never physically abused the victim. The State counters that defense counsel first raised the issue on direct examination and "opened the door" for the State to pursue the line of questioning on cross-examination as to the reason the victim moved out.

■ ■ " '[T]he omission of a witness to state a particular fact under

circumstances rendering it incumbent upon him to, or likely that he would, state such fact, if true, may be shown to discredit his testimony as to such fact.' " *People v. Batchelor*, 202 Ill. App. 3d 316, 328 (1990), quoting *People v. Henry*, 47 Ill. 2d 312, 321 (1970). A defendant who takes the stand on his own behalf offers himself as a witness, but also subjects himself to legitimate cross-examination. *People v. Burris*, 49 Ill. 2d 98 (1971). The proper scope of cross-examination rests within the sound discretion of the trial court, and it is also within the discretion of the trial court to decide whether evidence of prior crimes is relevant and admissible. *People v. Breton*, 237 Ill. App. 3d 355 (1992). Other crimes evidence is relevant for any purpose other than to show a defendant's propensity to commit a crime. *People v. Robinson*, 167 Ill. 2d 53, 62 (1995). Other crimes evidence may be relevant and admissible in the prosecution's case in chief to prove modus operandi, intent, identity, motive, or absence of mistake. *People v. Illgen*, 145 Ill. 2d 353 (1991). The danger in admitting such evidence is that it tends to "over persuade" the jury. *People v. Spiezio*, 105 Ill. App. 3d 769, 771 (1982). Another danger is that the jury may convict the defendant merely because it feels the defendant is a bad person who deserves to be punished. *People v. Placek*, 184 Ill. 2d 370 (1998). The trial court is required to weigh the probative value of the evidence against the prejudicial impact of the evidence. *People v. Jones*, 306 Ill. App. 3d 793, 799 (1999). The trial court's decision to admit such evidence will not be reversed absent an abuse of discretion resulting in manifest prejudice to defendant. *People v. King*, 248 Ill. App. 3d 253, 268 (1993.)

■ Prior-abuse evidence can be used by the State to rebut or impeach defendants claim of accident, justification or innocent intent. 2 J. Wigmore, Evidence §§ 302, 363 (Chadbourn rev. ed. 1979) (the reoccurrence of acts of the same sort tends to negate inadvertence in other forms of innocent intent). Prior acts of violence also may show hostility or provide evidence of a motive or intent to do further acts of violence. 2 J. Wigmore, Evidence §§ 365(3), 397, at 364, 443 (Chadbourn rev. ed. 1979). In *People v. McCarthy*, 132 Ill. 2d 331 (1989), the court allowed evidence that the defendant had previously assaulted the victim and her family to show that the defendant went to the victim's home on the night of her murder with the intent to harm her. The court noted that this evidence also was admissible to disprove the defendant's claim that he committed the homicide while acting under a sudden and intense passion.

Evidence that the defendant physically abused and verbally threatened his wife throughout their marriage was also held to be properly admitted in *Illgen. Illgen*, 145 Ill. 2d at 366. In *Illgen*, the supreme court concluded that evidence of the prior abuse was properly

admitted to show defendant's intent and motive and to establish that the shooting of the victim was not an accident. *People v. Illgen*, 145 Ill. 2d 353, 366 (1991). The evidence was admissible even though the last incident of physical abuse occurred approximately three years prior to the victim's death. The court noted that although the shooting incident, standing alone, might appear accidental, when considered together with the evidence of the defendant's prior unprovoked attacks upon his wife, the circumstances suggested that the shooting was deliberate and not accidental. *Illgen*, 145 Ill. 2d at 366. Here, although a complaint was filed and an order of protection was entered, defendant was not convicted of the domestic battery charged in the complaint. However, evidence of prior abuse of the victim by the defendant is still admissible in certain situations even when there is no conviction. *Illgen*, 145 Ill. 2d at 366.

In *People v. Jones*, 306 Ill. App. 3d 793 (1999), the defendant filed a motion *in limine* to prohibit the State from presenting evidence of the four years of his alleged physical abuse of the victim. The trial court ruled that some of the incidents were too remote in time. However, it concluded that the probative value of admitting other instances of physical abuse outweighed its prejudicial impact. *Jones*, 306 Ill. App. 3d at 799. The court noted that in each of the incidents the defendant committed an act of violence against the victim or engaged in conduct that could be deemed obsessive. Further, the incidents that were admitted all occurred within three months of the victim's murder. The appellate court agreed with the trial court's ruling and held that the trial court did not abuse its discretion in admitting the other crimes evidence where it was probative of defendant's intent and motive. *Jones*, 306 Ill. App. 3d at 799.

 In the present situation, defendant's answer elicited by his own attorney on direct examination that the reason for the victim moving out was due to arguments and the fact he was selling drugs was not completely accurate. In fact, physical violence motivated the victim to leave the defendant, and the victim left defendant as a direct result of domestic violence that occurred within hours of her moving out. This omission was material and served to discredit defendant's testimony. Further, like *Jones*, the prior abuse occurred within three months of the murder and impeached defendant's claim of self-defense as justification for killing the victim. *Jones*, 306 Ill. App. 3d at 800. Thus, we find that the State's use of the evidence was not only invited by defense counsel opening the door, but properly discredited defendant's testimony, was probative of defendant's intent and motive and impeached his claim of self-defense. The trial court did not abuse its discretion in allowing the State to cross-examine defendant with evidence of the prior abuse.

## III. IMPROPER CLOSING ARGUMENT

The defendant alleges three categories of improper closing argument that denied defendant a fair trial: (1) prosecution comment on defendant's prior bad acts; (2) argument that improperly shifted the burden of proof; and (3) erroneous comment by the prosecution about defendant's possible sentence. The State argues that defendant has waived review of these allegations and that the arguments were proper and did not serve as a material factor in the jury's verdict.

■ A prosecutor is given great latitude in making closing arguments, and the trial court's determination of the propriety of the argument will stand absent a clear abuse of discretion. *People v. Cisewski*, 118 Ill. 2d 163 (1987). While a prosecutor may not make arguments or assumptions that have no basis in evidence, improper comments or remarks are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused. *People v. Tipton*, 207 Ill. App. 3d 688, 699-700 (1990). Where there are allegations of prosecutorial misconduct, arguments of both the prosecutor and defense counsel must be reviewed in their entirety, and allegations of improper comment must be placed in their proper context. *Tipton*, 207 Ill. App. 3d at 701. We therefore examine the alleged improper comments in context of the entire record.

■ We first address defendant's contention that it was error for the court to permit prosecutors to reference prior bad acts by defendant in closing argument by arguing: "He is a woman abuser. He's beating her up, knocking her into a wall when she's seven and a half months pregnant just a couple months before." In order to preserve an alleged error for review, both a trial objection and a written post-trial motion raising the error are required. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defense counsel may waive the right to raise certain errors in a later proceeding by failure to object to those errors at trial. *People v. Coles*, 74 Ill. 2d 393 (1979). A fundamental concept of our adversary system is that counsel must contemporaneously object at trial to errors. *People v. Garcia*, 165 Ill. 2d 409 (1995). Counsel, by not giving the court the opportunity to prevent or correct errors at trial, may gain the advantage of obtaining a reversal through failure to act, either intentionally or inadvertently. *People v. Carlson*, 79 Ill. 2d 564, 577 (1980).

In this case, no trial objection was made to the alleged improper comments regarding defendant's prior bad acts. Moreover, the defendant's motion for new trial that, "The assistant [S]tate's [A]ttorney made prejudicial, inflammatory and erroneous statements in closing argument designed to arouse the prejudices and passions of the jury thereby prejudicing the defendant's right to a fair trial," was

too general to have alerted the court to the proposed error that defendant now argues on appeal. *People v. Sargent*, 184 Ill. App. 3d 1016 (1989). The failure to object, together with the general language of the motion for new trial, constitutes waiver. The plain error rule is a limited exception to the waiver doctrine which will preserve an issue for appellate review where an appellate court finds that the error is of such magnitude that the defendant was denied a fair trial or where the evidence is closely balanced. *People v. Friesland*, 109 Ill. 2d 369 (1985). Under the facts of this case, we find the plain error exception does not apply and these alleged errors are waived.

■ We next address defendant's argument that the prosecutor erroneously told the jury that the defendant had not met his burden of proof by arguing "It's the defense burden to prove the existence of a skate." Defendant did make an objection to that comment; however, other than the general reference to "erroneous statements" in the motion for new trial, defendant did not specify this alleged error in the motion for new trial. A vague and general reference to "erroneous statements" in defendant's motion for new trial failed to properly preserve this alleged error for review. *People v. Sargent*, 184 Ill. App. 3d 1016 (1989). Defendant also contends that the prosecution erroneously commented on defendant's burden of proof by arguing that "defendant hasn't proven it. Has to prove it and he didn't." We note there was no objection at trial. The failure to object, together with the vague reference to "erroneous statements" in defendant's motion for new trial, did not properly preserve this alleged error for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Sargent*, 184 Ill. App. 3d 1016. Regarding these various comments, the plain error exception does not apply for the reasons previously discussed. *People v. Friesland*, 109 Ill. 2d 369 (1985).

■ The defense contends that the prosecutor erroneously argued for a conviction on first degree murder based on the false claim that defendant would not be punished or imprisoned unless the jury returned a verdict of guilty for first degree murder by stating that any verdict other than a guilty verdict of first degree murder "lets him walk away from this." Specifically the prosecution argued:

> "It's time for you to come back for some justice with some justice for Tiffany Hankins. It's time for you to do something that says we're gonna write that final chapter for Tiffany Hankins and little Malcolm. And with your verdicts, Ladies and Gentlemen, with your signatures on the verdict forms of Guilty of First Degree Murder because any other verdict lets him walk away from this."

Defendant both objected to this comment and specifically alleged this comment was improper in his motion for new trial, thereby properly

preserving this error for review. The State responds that the trial court immediately informed the jury that it should not concern itself with sentencing issues and claims that the trial court's instruction cured any error. Furthermore, at the hearing on defendant's motion for mistrial, the prosecutor explained that what he meant to tell the jury was that any other verdict would let defendant "walk away from responsibility." Finally, the State argues that the prosecutor's comment must be considered harmless in light of the overwhelming evidence of defendant's guilt.

This comment was error for two reasons. First, it is error for a prosecutor to argue that, depending on the verdict, the defendant could avoid imprisonment when the jury plays no role in imposing punishment. *People v. Neeley*, 18 Ill. App. 3d 287 (1974). Second, such error is even more egregious when compounded by an inaccurate statement as to the punitive effect of the verdict. This court and our supreme court have consistently reminded the State to refrain from misstating potential sentences to the jury. See *People v. Cisewski*, 118 Ill. 2d 163 (1987); *People v. Thomas*, 266 Ill. App. 3d 914 (1994).

In this case it was undisputed that a voluntary act of the defendant was the cause of the victim's death. By closing argument the court had ruled that instructions on self-defense and first and second degree murder would be given. Defense counsel in closing argument asked the jury "to find Terrance Sutton guilty of second degree murder." The prosecutor's comment that any verdict other than guilty of first degree murder lets him walk away from this did not merely inform the jury about the possible sentence, but misinformed the jury as to the possible severity of the punishment the defendant could receive. For second degree murder a term of imprisonment shall be not less than 4 years and not more than 20 years. 730 ILCS 5/5—8—1(a)(1.5) (West 1996). Here, the defendant had a conviction for the Class X felony of aggravated arson within ten years of the date he caused the victim's death in this case, therefore if he were convicted of second degree murder he would not be eligible for probation. 730 ILCS 5/5—5—3(c)(2)(F) (West 1996). A verdict of guilty of second degree murder would not have let defendant "walk away from this." The prosecution incorrectly stated the law.

In *People v. Crossno*, 93 Ill. App. 3d 808, 823, 824 (1981), the court reversed a defendant's conviction based in part on a similar comment. In *Crossno*, the prosecutor stated in rebuttal that a conviction on a lesser included offense would be a slap on the wrist. The appellate court concluded that the prosecutor's reference to the severity of the sentence for involuntary manslaughter misinformed the jury since involuntary manslaughter was punishable by two to five years' imprison-

ment and that misinformation could not be challenged by the defense, except by way of an objection. *People v. Crossno*, 93 Ill. App. 3d 808, 824 (1981).

In *People v. Johnson*, 202 Ill. App. 3d 417, 425 (1990), the prosecutor argued "this is not a mandatory prison case" and that "there is a certain exception which counsel knows about." The State argued these remarks were proper because the Alcohol Substance Abuse Act (Act) (Ill. Rev. Stat. 1985, ch. 111½, par. 6301 *et seq.*) provides treatment to eligible offenders. There was nothing in the record to indicate that the defendant was an addict or eligible for treatment under the Act. The court reversed the conviction because the prosecutor incorrectly stated the law. In *People v. Cisewski*, 118 Ill. 2d 163, 177 (1987), the prosecutor told the jury that a voluntary manslaughter verdict would enable the defendant to "walk out of that door today" and escape punishment for her crimes. The court affirmed the conviction however, because the prosecutor's comment was brief and the trial court sustained defendant's objection. The court noted that although the prosecutor should not have made the remark, the court could not conclude that it had a material effect on the verdict.

Unlike *Cisewski*, here we cannot say this error did not have a material effect on the verdict. We note, as a result of the defense objection, the court instructed the jury "you're not to concern yourself with possible punishment or sentence of the charge during your deliberation." However, the prosecutor made this comment at the end of the rebuttal argument and defense counsel, other than by way of objection, had no opportunity to substantively challenge the improper comment. We cannot say beyond a reasonable doubt that the jury's verdict did not reflect the view that defendant would go free and "walk away from this" if the jury returned a verdict of guilty for second degree murder. The cumulative effect of this improper comment, together with the improper cross-examination of defendant with statements he made to Dr. Conroe, warrants reversal.

## CONCLUSION

A review of the record contains sufficient evidence to prove defendant guilty beyond a reasonable doubt of first degree murder and double jeopardy does not bar retrial of this offense. *People v. Porter*, 168 Ill. 2d 201, 215 (1995). We also note we have made no findings as to defendant's guilt that would be binding on retrial. *People v. Jones*, 175 Ill. 2d 126, 134 (1997). As this case is being remanded for retrial, we need not address the sentencing issue.

For the foregoing reasons, the judgment of the circuit court of

Cook County is reversed and remanded for retrial consistent with this opinion.

Reversed and remanded.

O'BRIEN and GALLAGHER, JJ., concur.