# Illinois Official Reports

## Appellate Court

*People v. Williams*, 2017 IL App (1st) 142733

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TOROLAN WILLIAMS, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-2733 |
| Filed<br>Rehearing denied | August 28, 2017<br>September 20, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-15108; the Hon. Carol M. Howard, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Deepa Punjabi, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon Walters, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justice Simon concurred in the judgment and opinion.<br>Justice Mikva specially concurred, with opinion. |

**OPINION**

¶ 1    The defendant, Torolan Williams, was charged with five counts of first degree murder and one count of armed robbery. During the ensuing trial, the State used historical cell phone site data and defendant's own statement that he was a lookout to implicate him in the crimes. After hearing all the evidence, the jury found defendant guilty on all counts. The trial court sentenced him to life in prison for the five murders and 20 years in prison for the armed robbery.

¶ 2    Defendant raises several issues on appeal. Defendant argues that (1) the trial court erred in failing to suppress statements that he acted as a lookout because they were the product of coercion, (2) the trial court erred in admitting the historical cell phone site records into evidence, (3) the State improperly presented evidence concerning possible sentencing, (4) the State violated a pretrial ruling concerning the use of the historical cell phone site records, and (5) he suffered prejudice when the trial court referred to three of the verdict forms as "guilty forms."

¶ 3    Based on the record before this court, the trial court did not err in admitting the historical cell site records or incriminating statements, and defendant was not denied a fair trial.

**JURISDICTION**

¶ 5    On May 22, 2014, a jury found defendant guilty of five counts of first degree murder and one count of armed robbery. On June 22, 2014, he filed a motion for a new trial. On August 15, 2014, the trial court denied defendant's motion and sentenced him to life in prison on the murder convictions and 20 years on the armed robbery conviction. Defendant timely filed his notice of appeal on the same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

**BACKGROUND**

¶ 7    On appeal, defendant does not challenge the sufficiency of the evidence used to convict him. We therefore only discuss the facts relevant to the disposition of this appeal.

¶ 8    On the night of April 22, 2008, Lakesha Doss, Whitney Flowers, Anthony Scales, Reginald Walker, and Donovan Richardson were shot to death in a house at 7607 South Rhodes Avenue in Chicago, Illinois. On the morning of June 9, 2008, defendant was at Northwestern Hospital for the birth of his son when two Chicago police detectives arrested him in connection with the murders.

¶ 9    Prior to trial, defendant filed a motion to suppress statements he made while in police custody. The motion alleged that due to defendant's "physical, mental, and psychological state, the police refusal to allow Torolan to make a phone call coerced Torolan to make statements that were not freely and rationally given." At the hearing on the motion, Chicago police detective Murphy testified that, upon arrival at Area 2 police headquarters, defendant was placed into an interview room, advised of his *Miranda* rights, and indicated that he understood them. *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant first requested to make a phone call at 10:08 a.m., which was denied. His second request was denied just after 11 a.m. At that time, Detective Murphy, who was preparing defendant to be transported to a nearby

location, told defendant that he could make a phone call when he went to lockup. The detectives drove defendant to the area of 69th Street and Martin Luther King Drive, and then returned to Area 2 around 1 p.m. At that time, defendant agreed to take a polygraph. On the way to take the test, and while still shackled, defendant jumped out of the detectives' vehicle and started running down the street. After returning to Area 2, defendant stated he jumped out because he was trying to make a phone call.

¶ 10    At just after 2 p.m., defendant stated that his son was born prematurely after a risky and complicated delivery. He told the detectives his son was being tested every 20 minutes due to medical problems. Defendant informed the officers he knew who did it and would talk to a State's Attorney, but wanted to make sure his son was okay. The detectives declined his request for a phone call again—his fifth request.

¶ 11    Shortly thereafter, defendant indicated that he had additional information about the murders. In response, defendant was given his *Miranda* rights and again stated that he understood them. Defendant asked to speak with a State's Attorney and began speaking to detectives about the offense. Defendant had denied any involvement, but during this conversation, he stated that he had acted as a lookout for Michael King, who he claimed committed the murders.

¶ 12    At 5:45 p.m. Assistant State's Attorney (ASA) Fabio Valentini arrived to speak with the defendant. At around 6:30 p.m., defendant invoked his right to counsel and questioning ceased. About half an hour later, defendant experienced stomach pains, and detectives transported him to Roseland Hospital. While at the hospital, and unknown to the detectives, defendant phoned a friend, who then called an attorney. Attorney John Lyke testified that he went to Roseland Hospital to see defendant but was not allowed entry to defendant's room. Attorney Lyke left the hospital without seeing defendant.

¶ 13    In its ruling on defendant's motion to suppress, the trial court ruled that defendant's statement made prior to his invocation of counsel at 6:28 p.m. would be admissible because defendant had not yet requested an attorney. The trial court suppressed the statements made at the hospital because attorney Lyke was denied access to the defendant. The trial court also suppressed statements made to the ASA later in the evening after the hospital.

¶ 14    Prior to trial, defendant also sought a *Frye* hearing on the State's proposed use of cell phone tower evidence. *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The State sought to use the cell phone records of Michael King and Arthur Brown to establish that their cell phones had connected to cell towers near the crime scene at the time of the offense. The State argued that the court did not need to hold a *Frye* hearing because there was nothing novel about the technology or science at issue. The court heard testimony from FBI Agent Joseph Raschke that cell phones connect to cell towers via radio waves and the cell phone companies collect certain information during this process. Agent Raschke testified that he used the records provided to plot King's and Brown's cell phones on a map. After hearing this testimony, the court denied defendant's request for a *Frye* hearing. The court ruled that Agent Raschke could testify as to the location of the cell towers activated by the pair's cell phones the night of the murders. The trial court would not let Agent Raschke testify as to the exact location of the cell phones, or the precise coverage area of the connecting tower.

¶ 15    At trial, the State called Arthur Brown to testify concerning the events of the night of the murder. He acknowledged that he signed a cooperation agreement with the State on May 24,

2015. Brown agreed to testify at King's and defendant's trials in exchange for pleading guilty to one count of first degree murder for which he would serve 24 years in prison.

¶ 16    Brown explained that he and defendant were old high school friends. In April 2008, Brown lived in Lansing, Illinois. On April 22, Brown and his friend, Michael McKeel, were in Lansing drinking and smoking marijuana together. Eventually they ran out of drugs and decided to drive into the city using McKeel's car to buy more. After failing to find any, Brown called defendant and asked him if he knew where he could get some "kush," a high-grade marijuana. Defendant invited them to his home, and the pair drove to 71st Street and Eggleston Avenue. When they arrived at defendant's residence, defendant stated that he would call Michael King to see if King had any kush. King told the group to meet him at 77th Street and Rhodes Avenue. When they arrived, defendant used Brown's phone to call King. Defendant left the car for several minutes and upon returning informed the pair that he had a "sweet lick," which Brown testified meant an easy robbery. Defendant asked Brown to stay and assist, which Brown did.

¶ 17    Brown explained that about an hour later, defendant called from a number he did not recognize. Defendant asked him to come down to the alley, and Brown went to the alley south of 76th Street off of Rhodes Avenue, where he observed King's Ford Focus parked by a garage. Brown sat on the steps of a nearby fire escape and waited. Eventually, King approached while carrying a flat screen television. Brown identified this television as being part of the State's evidence. Brown then saw defendant carrying a duffle bag. Brown placed the television in the car along with three others. Brown explained that they formed an assembly line, with King and defendant bringing items out of the house and Brown loading the goods. After they were done, the three drove back to defendant's place. In the car, defendant and King were talking and saying things like, "you're crazy, you're crazy," and "that was some crazy stuff that just went on." Upon arriving back at defendant's house, defendant said they would split the goods in the morning.

¶ 18    Brown would identify several items at trial that he stated were also proceeds from the robbery, including a Microsoft X-Box video game system and several pieces of jewelry. He identified two watches and a pair of diamond stud earrings that defendant had given Brown as proceeds from the robbery. Brown later pawned the items and the police recovered them along with receipts with Brown's name on them. Other witnesses identified the goods as having belonged to the victims.

¶ 19    Brown eventually confronted defendant about the murders. Defendant told Brown that when he entered the house, King had already killed everybody. King ordered him around and he complied out of fear. On July 1, 2008, Brown was arrested for his involvement in the murders. While first denying his involvement, Brown eventually acknowledged his role after being confronted with the pawn receipts. While incarcerated, Brown had a conversation with defendant in the stairwell in Division 10 of the jail. Brown wanted to know what really happened the night of the murders, and defendant informed him they went into the house to rob it. Defendant explained to Brown that during the robbery, defendant shot Donovan Richardson while he was sitting on the couch and then shot one of the girls after she would not stop screaming. King then shot the remaining victims.

¶ 20    Agent Raschke testified consistently with his pretrial testimony. He explained that in connection with this case, he reviewed call detail records for Arthur Brown and Michael King and plotted them on a map. He testified that cell phones generally connect to the closest tower

but this was not always the case. On cross-examination, he acknowledged that the information does not allow for the conclusion that a phone was at a certain address. He admitted that while the phone does normally connect to the closest tower, factors other than proximity can affect signal strength and which tower a phone will use.

¶ 21 During closing argument, the defense asserted that the State had failed to meet its burden of proof. Defense counsel argued that the State's witnesses, particularly Brown, were not credible. The State argued that its witnesses were credible and their testimony was backed up by the cell phone records. In both closing and rebuttal, the State contended that the cell tower evidence demonstrated that Brown was at defendant's house before and after the offense, and King came to defendant's residence in the middle of the night after the offense, as well as later the next morning. The State argued these records corroborated Brown's account of events.

¶ 22 The jury convicted defendant of five counts of first degree murder and one count of armed robbery. Defendant was sentenced to life in prison for the five counts of murder and a consecutive term of 20 years for the armed robbery. Defense counsel filed a posttrial motion, which the trial court denied.

¶ 23 Defendant timely filed his notice of appeal.

¶ 24                                                    ANALYSIS

¶ 25 Defendant raises several issues on appeal: (1) the trial court erred in failing to suppress all statements made while in police custody, (2) he was entitled to a *Frye* hearing on the cell phone tower records evidence, (3) he was denied a fair trial by the State's inclusion of a potential sentence in its videotape evidence, (4) the State violated the trial court's order regarding the use of the cell phone tower records, and (5) he was denied a fair trial when the court referred to three of the verdict forms as "guilty forms" during the jury instruction phase.

¶ 26 In his first issue, defendant argues that the trial court erred when it declined to suppress the statements he made prior to his invocation of his right to counsel. Defendant argues that the denial of his request in this case constituted a violation of section 103-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-3 (West 2016)) and a violation of his due process rights requiring suppression of his implicative statements. After defendant was arrested, but before he invoked his right to counsel later in the evening on June 9, defendant made several requests to place a phone call, which were denied. Initially, defendant did not explain the reason for making the phone call and only later stated it was to check on the status of his newborn son. Prior to his request for counsel at 6:28 p.m., defendant was given his *Miranda* rights four separate times, and each time he indicated he understood those rights. The trial court suppressed all statements made after defendant's 6:28 p.m. invocation of counsel.

¶ 27 "[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession [citation], and even though there is ample evidence aside from the confession to support the conviction." *Jackson v. Denno*, 378 U.S. 368, 376 (1964). "In determining whether a statement is voluntary, a court must consider the totality of the circumstances of the particular case; no single factor is dispositive. Factors to consider include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the presence of *Miranda* warnings; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises." *People v. Richardson*, 234 Ill.

2d 233, 253-54 (2009). "[T]he test of voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996).

¶ 28    Constitutional suppression issues are reviewed under a bifurcated standard of review: factual findings are reversed only if they are against the manifest weight of the evidence, but the ultimate legal conclusion about whether suppression is warranted is reviewed *de novo*. *In re Christopher K.*, 217 Ill. 2d 348, 373 (2005).

¶ 29    Defendant also claims his statutory right under section 103-3 of the Code was violated. This statute provides: "Persons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner. Such communication shall be permitted within a reasonable time after arrival at the first place of custody." 725 ILCS 5/103-3 (West 2016). We note this statute contains no remedy for an alleged violation.

¶ 30    After reviewing the trial court's ruling and the record from the suppression hearing, we find no errors with the trial court's handling of this matter. The totality of the circumstances demonstrates that defendant's unsuppressed statements were voluntarily given, despite the denial of his requests to make a phone call. Defendant's statements before his invocation of counsel were voluntary, including the statement implicating him in the murders. While defendant's requests to use the phone were denied, defendant did not initially disclose the purpose of the phone call, but later stated it was to check on the status of his newborn son. We conclude, as did the trial court, that denial of these requests did not render defendant's statements involuntary.

¶ 31    Defendant had previous encounters with the criminal justice system, having pled guilty to three misdemeanors and a violation of probation. The detectives allowed defendant to use the restroom and provided water to drink. Defendant received *Miranda* warnings four times before requesting an attorney and each time indicated his understanding of those rights. After returning to Area 2 following his escape attempt, defendant declined medical assistance. While defendant claimed his requests for a phone call were to check on the condition of his newborn son, who was sick and in need of testing every 20 minutes, defendant did not inform the officers of this fact until several hours into his custody. At the suppression hearing, defendant submitted no records concerning his son's condition at the time or why the tests were being carried out.

¶ 32    In finding the unsuppressed statements were voluntarily made, we find those cases relied on by defendant to be readily distinguishable. We reject his reliance on *Haynes v. Washington*, 373 U.S. 503 (1963). While acknowledging that like the defendant in *Haynes*, our defendant was denied access to a phone call, the other facts of this case distinguish it from *Haynes*. In *Haynes*, the record established that defendant was held incommunicado for 16 hours before confessing. *Id.* at 504. This detention continued for another five days while the police attempted to obtain a written confession. *Id.* Unlike the *Haynes* defendant, our defendant was in custody for less than five hours before making an incriminating statement. Our defendant, unlike in *Haynes*, was advised of his rights while in custody several times and each time indicated he understood those rights. Moreover, unlike *Haynes*, the facts of this case do not demonstrate that defendant's will was overborne. *Id.* at 513 (confession was obtained in an

atmosphere of substantial coercion and inducement created by statements and actions of state authorities).

¶ 33    Defendant's reliance on *People v. Westmorland*, 372 Ill. App. 3d 868 (2007), and *United States v. Ramirez*, No. 14-617, 2015 WL 4393744 (D.N.J. 2015), is also misplaced. In *Westmorland*, the defendant was a 17-year-old juvenile, who the trial court found to be immature, frightened, and wide-eyed for his age, which suggested vulnerability to police pressure. 372 Ill. App. 3d at 879. Our defendant shares none of the same physical or mental characteristics as the *Westmorland* defendant.

¶ 34    In *Ramirez*, the district court found defendant's statements to be involuntary where he was denied access to information concerning his gravely ill son who had been transported to the hospital immediately prior to his arrest. 2015 WL 4393744 at *3. In *Ramirez*, defendant's son's condition was so dire that defendant's cell phone received almost 70 texts and calls from his wife and mother-in-law during the custodial interview. *Id.* at *6. The district court noted that the circumstances would create a "tremendous amount of psychological pressure upon a parent." *Id.* The defendant, who did not speak English, testified that he believed that if he cooperated he could leave to see his son. *Id.* A review of the video of defendant's interrogation does not show anything close to the kind of extreme circumstances that were present in *Ramirez*.

¶ 35    In conjunction with a finding of voluntariness, we find no violation of defendant's rights under section 103-3. In *People v. Prim*, our supreme court stated that the purpose of this statute is to "permit a person held in custody to notify his family of his whereabouts and to notify them of the nature of the offense with which he is charged so that arrangements may be made for bail, representation by counsel and other procedural safeguards that the defendant cannot accomplish for himself while in custody." 53 Ill. 2d 62, 69-70 (1972). At no time prior to his invocation of counsel did defendant state the phone call was to request an attorney or inform his family of his location so they could provide an attorney. Defendant also does not fit the profile of an adult in need of familial assistance while in police custody. See *People v. Green*, 2014 IL App (3d) 120522, ¶ 58 (rejecting reliance on section 103-3 because defendant exhibited none of the characteristics of an individual requiring familial assistance while in police custody). We adhere to *Prim* that the purpose of the statute is to ensure access to counsel and other procedural safeguards while in custody, and based on this, defendant's right under section 103-3 was not violated.

¶ 36    Based on the totality of the circumstances, we agree with the trial court that the statements made at Area 2 prior to the request for counsel were voluntary. We therefore find no error in the trial court's ruling concerning defendant's motion to suppress.

¶ 37    In the next issue, defendant argues that the trial court erred in denying his motion for a *Frye* hearing concerning the use of the historical cell phone tower records. Before this court, defendant argues that cell phone tower records do not meet the required *Frye* standard to be admitted in an Illinois court. The State points to *People v. Fountain*, 2016 IL App (1st) 131474, a recent case where this court addressed this exact issue and determined the trial court did not err in denying a *Frye* hearing. It held that the reading coordinates of cell sites from phone records and plotting them on a map is not a scientific procedure or technique implicating *Frye*. *Id.* ¶ 58.

¶ 38    In Illinois, expert testimony of scientific evidence is admissible when it is "sufficiently established to have gained general acceptance in the particular field in which it belongs."

(Internal quotation marks omitted.) *In re Commitment of Simons*, 213 Ill. 2d 523, 529 (2004). Our supreme court has recognized that "the *Frye* test is necessary only if the scientific principle, technique or test offered by the expert to support his or her conclusion is 'new' or 'novel.' " *People v. McKown*, 236 Ill. 2d 278, 282-83 (2010). "Once a principle, technique, or test has gained general acceptance in the particular scientific community, its general acceptance is presumed in subsequent litigation; the principle, technique, or test is established as a matter of law." *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 79 (2002), *abrogated on other grounds by Simons*, 213 Ill. 2d at 530. A court may determine the general acceptance of a scientific methodology either: "(1) based on the results of a *Frye* hearing; or (2) by taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject." *People v. McKown*, 226 Ill. 2d 245, 254 (2007). The inquiry under *Frye* is the general acceptance of a methodology, not its application to a particular case. *Donaldson*, 199 Ill. 2d at 77.

¶ 39    We agree with the State and this court's prior ruling in *Fountain* that a *Frye* hearing was not required because the information conveyed is not the result of new or novel scientific principles. Agent Raschke testified that a cell phone uses radio signals to connect to cell towers, which is generally but not always the closest tower to the cell phone. Once the phone's radio signal connects to the tower, the company records some basic information about the call, such as phone numbers involved, the length of the call, and the identification of the connecting tower. Agent Raschke explained that if the dialing phone is unable to make the initial connection, no record is made. Agent Raschke uses these records and plots the call and corresponding tower on a map.

¶ 40    The State introduced the evidence not to show an exact location but that the cell phones, and by implication their owner, were in the vicinity of the crimes during the relevant time period. Defendant makes no argument concerning the cell companies' ability to accurately record the stated information, nor does he argue that the use of radio waves are in some way "new" or "novel." Defendant's argument that this method represents the least accurate way in estimating a cell phone's location goes toward the weight to be given to this type of evidence, not its admissibility. Accordingly, we find no reason to depart from *Fountain* and the trial court did not err in denying defendant's motion for a *Frye* hearing. *Fountain*, 2016 IL App (1st) 131474, ¶ 58.

¶ 41    Lastly, defendant argues that the discussion of a possible sentence contained within the interrogation video shown to the jury unfairly prejudice him. Additionally, he argues that the State made improper arguments during closing statements in violation of the trial court's order concerning the use of the cell tower records and the trial court's referral to three verdict forms as "guilty forms" was prejudicial. He argues each sub-issue, on its own, warrants remand for a new trial.

¶ 42    In the first sub-issue, while the State should not have included any discussion of a possible sentence defendant could have received in the interrogation video, we conclude the sentencing discussion in this case did not prejudice the defendant so as to require a new trial. Our supreme court has stated that it is not proper for a prosecutor to make arguments unsupported by the evidence, but comments concerning sentencing do not mandate a new trial unless they fall into two narrow categories. *People v. Sutton*, 316 Ill. App. 3d 874, 893 (2000) (providing that improper comments or remarks are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused). When a defendant alleges

prosecutorial misconduct, the court reviews the comments in their entirety and "allegations of improper comments must be placed in their proper context." *Id.*

¶ 43 The allegedly improper statement on sentencing occurred when the State published the police interrogation video with the defendant. During the exchange, defendant had a discussion with ASA Valentini about possible sentences and the following exchange occurred:

"DEFENDANT: What's the minimum, what's the minimum sentence?

ASA VALENTINI: For first degree murder, 20 years in prison.

DEFENDANT: And the maximum is death?

ASA VALENTINI: Right."

While such an exchange should not have been heard by the jury, its inclusion did not result in substantial prejudice to the defendant. During the trial, the ASA did not discuss any possible sentence or what impact the jury's verdict would have on any possible punishment. As the trial court noted, the sentencing discussion is not accurate. When defendant went to trial in 2014, Illinois had already abolished the use of the death penalty. Importantly, the trial court also admonished the jury to disregard the entire discussion concerning the possible sentence defendant faced. The trial judge explained that the court would impose sentence only if a guilty verdict was returned. Prior to jury deliberations, the trial court again instructed the jury to not concern themselves with any possible sentence.

¶ 44 Defendant's reliance on *People v. Sutton*, 316 Ill. App. 3d 874 (2000), is misplaced. In *Sutton*, this court found it to be reversible error where the prosecutor argued to the jury that any verdict other than first degree murder would let the defendant walk away. *Id.* at 894 (defendant had been charged with both first and second degree murder). Unlike *Sutton*, the comment on sentencing in this case did not direct the jury to find defendant guilty of the most significant charge in order to prevent him from walking away or that finding him guilty of a less charge would be a "slap on the wrist." *Id.*; *People v. Crossno*, 93 Ill. App. 3d 808, 823-24 (1981) (defendant prejudiced by improper statement that a conviction on a lesser offense would be a slap on the wrist). Within this context, we do not consider the sentencing comment to have been so prejudicial to have denied him a fair trial nor, given the evidence, did it represent a material factor in his conviction.

¶ 45 Next, defendant argues that the State violated the trial court's pretrial order concerning the use of the cell phone tower records when it made certain comments during closing statements. After reviewing the record, defendant failed to properly preserve this issue for review by failing to object when the comments were made and by failing to include it in his posttrial motion.

¶ 46 In order to preserve an alleged error for review, Illinois law requires both a trial objection and a written posttrial motion raising the error. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). By failing to object at trial, a defendant may waive the right to raise certain errors later. *Sutton*, 316 Ill. App. 3d at 893. By failing to contemporaneously object at trial, a party denies the trial court the opportunity to correct errors immediately, and may gain the advantage of obtaining a later reversal through the failure to act. *People v. Carlson*, 79 Ill. 2d 564, 577 (1980).

¶ 47 Defendant points to five excerpts from the State's closing argument that he alleges violated the trial court's pretrial order concerning the use of the cell phone tower records but the record shows no contemporaneous objection. While defendant claims he raised the issue in his posttrial motion, the cited argument pertains to the issue on the admissibility of the cell phone

tower evidence under *Frye*, not the State's comments on them during closing. See *People v. Witherspoon*, 33 Ill. App. 3d 12, 21 (1975) (failure to allege errors in motion for new trial results in waiver). The trial court was in the best position to enforce an order it made orally prior to the start of trial. By failing to either contemporaneously object or raise the issue in a posttrial motion, the defendant deprived the trial court of an opportunity to correct any violation by the State. Thus defendant has waived review of the issue on appeal and we will not consider it.

¶ 48    Finally, defendant argues that the trial court's reference to three of the verdict forms as "guilty forms" during the instruction phase of trial also prejudiced him and resulted in an unfair trial. When the trial court provided the jury with the applicable instructions, the trial court referred to the verdict forms for the murders of Reginald Walker, Anthony Scales, and Whitney Flowers as "guilty forms." Normally, defendant would have waived review of the issue because no contemporaneous objection was made and he did not address it in the posttrial motion, however, Illinois Supreme Court Rule 451(c) provides that substantial defects in criminal instructions are not waived by the failure to object "if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). This rule is coextensive with the plain error rule and the analysis is the same. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007).

¶ 49    The plain error doctrine allows a reviewing court to consider an unpreserved error "when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* at 565. Under the plain error rule, we consider whether any error has occurred at all. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). We therefore turn to whether an error occurred before considering it under the plain error doctrine.

¶ 50    Illinois law requires the trial court to ensure that the jury is "properly instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof." *People v. Sanders*, 129 Ill. App. 3d 552, 563 (1984). A defendant has the right to a fair and impartial trial "free from influence or intimation by the trial court." *People v. Sprinkle*, 27 Ill. 2d 398, 402 (1963). Jurors carefully watch trial judges, and even the slightest word " 'may prove controlling.' " *People v. Mitchell*, 228 Ill. App. 3d 167, 169 (1992) (quoting *People v. Marino*, 414 Ill. 445, 450-51 (1953)). A failure to instruct the jury in the above three concepts serves to deprive a defendant of a fair and impartial trial. *People v. Williams*, 120 Ill. App. 3d 900, 904 (1983). It is the defendant's burden to demonstrate prejudice resulting from an alleged instruction error. *People v. Wells*, 106 Ill. App. 3d 1077, 1086 (1982).

¶ 51    This record is markedly different from *People v. Sanders*, 129 Ill. App. 3d 552 (1984), and *People v. Mitchell*, 228 Ill. App. 3d 167 (1992), cited by the defendant. In *Sanders*, this court found the trial court's comments to be reversible error because "not only were the attempted murder instructions contradictory, they incorrectly set forth the burden of proof." 129 Ill. App. 3d at 564. In *Mitchell*, we granted the defendant a new trial because the trial court had made at least six highly prejudicial remarks that attacked defendant's theory of the case, evidence, and the defense attorney. 228 Ill. App. 3d at 169-70. The *Mitchell* court also found the trial court gave inconsistent rulings of law in favor of the State. *Id.* at 171.

¶ 52    When viewed within the entire context of the jury instruction phase, we conclude that the trial court's reference to "guilty forms" does not constitute to a clear or obvious error resulting

in prejudice to the defendant. The court began the instruction phase by stating that "no ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be." The court then informed the jury that the defendant had pled not guilty to both the first degree murder and robbery charges. The trial court continued that the defendant is "presumed innocent of the charges against him" and "this presumption remains with him throughout every stage of the trial and during your deliberations." The court told the jury the State had the burden of overcoming this presumption and defendant was not required to prove his innocence. The trial court then correctly provided the required elements the State needed to prove in order to obtain a first degree murder conviction. It was explained that these elements needed to be proven for each of the decedents the State alleged defendant murdered. Notably, on appeal, defendant does not argue that the core concepts discussed in *Sanders* were not all correctly provided to the jury. *Sanders*, 129 Ill. App. 3d at 563.

¶ 53    The court discussed the verdict forms that it would provide the jury. The court told the jury that it would be provided with a guilty and not guilty form for each charged offense. The trial court then read each verdict form to the jury. It is during this discussion that the court misspoke. When discussing the verdict forms for the murders of Reginald Walker, Anthony Scales, and Whitney Flowers, the court mistakenly referred to the forms as "guilty forms." Despite this misspeak, the transcript shows the court informed the jury they would receive a guilty and not guilty form for those decedents. The court closed by noting a guilty and not guilty form would be provided for the armed robbery. While the trial court should not have made such a reference, we conclude the statements do not amount to a clear or obvious error requiring a new trial.

¶ 54                              CONCLUSION

¶ 55    For the foregoing reasons, we affirm defendant's five convictions for first degree murder and one conviction for armed robbery.

¶ 56    Affirmed.

¶ 57    JUSTICE MIKVA, specially concurring.

¶ 58    I join in the court's opinion in all respects, with the exception of *supra* ¶ 35. I do not believe that the police complied with their obligation under section 103-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-3 (West 2014)). Section 103-3(a) requires:

> "Persons who are arrested shall have the right to communicate with an attorney of their choice and a member of their family by making a reasonable number of telephone calls or in any other reasonable manner. Such communication shall be permitted within a reasonable time after arrival at the first place of custody." 725 ILCS 5/103-3(a) (West 2014).

¶ 59    As the majority acknowledges, after having made four other requests for a phone call during his over four hours in custody, defendant made a fifth request for a phone call at 2 p.m., in which he made clear that he wanted to use the phone call to assure that his son, who was being tested every 20 minutes due to medical issues, was okay. While the majority is correct that our supreme court has noted that the purpose of the statute is to allow a person in custody to notify family of the arrest so that the family might provide an attorney or make arrangements

for bail, the plain language of the statute is not limited to phone calls that are made for this purpose. It was simply not reasonable to refuse defendant's repeated requests for a phone call to inquire about the medical condition of his son.

¶ 60 However, as the majority points out, the statute does not contain a remedy and defendant relies on the statutory violation only as evidence that his statement was involuntary. Given the totality of circumstances in this case, I agree with the majority that the trial court did not err in finding that it was not.