2021 IL App (1st) 190535

FIRST DISTRICT
SIXTH DIVISION
May 14, 2021

No. 1-19-0535

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 15108 |
| | ) | |
| TOROLAN WILLIAMS, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justice Connors concurred in the judgment and opinion.
Presiding Justice Mikva dissenting, with opinion.

**OPINION**

¶ 1 Defendant, Torolan Williams, appeals the judgment of the circuit court dismissing his postconviction petition at the first stage. On appeal, defendant contends that the dismissal was error where his petition presented a gist of an arguable claim that his mandatory life sentence is unconstitutional as applied to him where he was 22 years old when he committed the offenses and the trial court had no opportunity to consider his youth or rehabilitative potential. For the following reasons, we affirm.

¶ 2 I. JURISDICTION

¶ 3 The circuit court dismissed defendant's postconviction petition on January 22, 2019. This court allowed defendant to file a late notice of appeal on March 21, 2019. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art.

VI, § 6) and Illinois Supreme Court Rule 651(a) (eff. July 1, 2017), governing appeals in postconviction proceedings.

¶ 4                                    II. BACKGROUND

¶ 5     The following are facts relevant to the dismissal of defendant's postconviction petition. A full statement of the facts can be found in this court's opinion pertaining to defendant's direct appeal. See *People v. Williams*, 2017 IL App (1st) 142733.

¶ 6     On the night of April 22, 2008, Lakesha Doss, Whitney Flowers, Anthony Scales, Reginald Walker, and Donovan Richardson were shot to death in a house at 7607 South Rhodes Avenue in Chicago, Illinois. On June 9, 2008, defendant was arrested in connection with the murders. At the police station, defendant was informed of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966), and he stated that he understood them. During his conversation with detectives, defendant stated that he acted as a lookout for Michael King, the person who committed the murders. At 5:45 p.m. Assistant State's Attorney (ASA) Fabio Valentini arrived to speak with the defendant.

¶ 7     At trial, the State called Arthur Brown to testify concerning the events of April 22, 2008. Brown agreed to testify at King's and defendant's trials in exchange for pleading guilty to one count of first degree murder, for which he received a sentence of 24 years in prison.

¶ 8     Brown testified that he and defendant were old high school friends. On April 22, 2008, Brown and his friend, Michael McKeel, were in Lansing drinking and smoking marijuana together. When they ran out of drugs, they decided to drive into the city to purchase more. After failing to find more drugs, Brown called defendant and asked if he knew where to get some "kush," a high-grade marijuana. They went to defendant's home, and defendant called Michael King, who told

them to meet him at 77th and Rhodes. When they arrived at that location, defendant left the car for several minutes. Upon his return, he informed them that he had a "sweet lick." Brown testified that the term referred to an easy robbery. Brown agreed to stay and assist in the robbery.

¶ 9 About an hour later, defendant called and asked Brown to come to an alley nearby. King approached carrying a flat-screen television, and defendant followed carrying a duffle bag. Brown testified that they formed an assembly line, with King and defendant bringing items out of the house and Brown loading the goods. After they finished, they drove back to defendant's place. In the car, defendant and King were saying things like "you're crazy, you're crazy" and "that was some crazy stuff that just went on." Defendant said they would split the goods in the morning.

¶ 10 Brown identified several items at trial that were proceeds from the robbery including a Microsoft Xbox video game system and several pieces of jewelry. He also identified two watches and a pair of diamond stud earrings that defendant had given him. Brown pawned the items, which the police later recovered along with receipts bearing Brown's name. Other witnesses identified the goods as having belonged to the victims.

¶ 11 When Brown confronted defendant about the murders, defendant said that King had already killed everyone by the time he entered the house. King had ordered him around, and he complied out of fear. On July 1, 2008, Brown was arrested for his involvement in the murders. Although he first denied involvement, Brown eventually acknowledged his role after being shown the pawn receipts. While incarcerated, Brown again spoke with defendant about the murders. Defendant told him that during the robbery, he shot Donovan Richardson. He then shot one of the girls because she would not stop screaming. King shot the remaining victims.

¶ 12    Agent Raschke testified that in connection with this case, he reviewed call detail records for Arthur Brown and Michael King and plotted them on a map. He testified that cell phones generally connect to the closest tower but that this was not always the case. On cross-examination, he acknowledged that the information does not allow for the conclusion that a phone was at a certain address. He admitted that, while the phone does normally connect to the closest tower, factors other than proximity can affect signal strength and which tower a phone uses.

¶ 13    During closing argument, the defense argued that the State had failed to meet its burden of proof. Defense counsel argued the State's witnesses, particularly Brown, were not credible. In both closing and rebuttal, the State contended that the cell tower evidence demonstrated that Brown was at defendant's house before and after the offense. That evidence also showed that King came to defendant's residence in the middle of the night after the offense, as well as later the next morning. The State argued these records corroborated Brown's account of the events.

¶ 14    The jury convicted defendant of five counts of first degree murder and one count of armed robbery. At the sentencing hearing, the court noted that it received defendant's presentence investigative report (PSI), but it contained only defendant's criminal background information because defendant refused to cooperate with the officer assigned to the report. When the court asked if either side wanted to add anything to the PSI, both parties responded, "no." The State entered victim impact statements into evidence. Defendant declined to say anything in allocution. After reviewing the notes in the case, the PSI, mitigating and aggravating factors, and the victim impact statements, the court imposed the mandatory sentence of natural life in prison pursuant to section 5-8-1 of the Unified Code of Corrections. 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2014).

¶ 15    On direct appeal, defendant raised a number of issues including:

"(1) the trial court erred in failing to suppress statements that he acted as a lookout because they were the product of coercion, (2) the trial court erred in admitting the historical cell phone site records into evidence, (3) the State improperly presented evidence concerning possible sentencing, (4) the State violated a pretrial ruling concerning the use of the historical cell phone site records, and (5) he suffered prejudice when the trial court referred to three of the verdict forms as 'guilty forms.' " *Williams*, 2017 IL App (1st) 142733, ¶ 2. This court affirmed his convictions. *Id.* ¶ 55.

¶ 16    On October 24, 2018, defendant filed a *pro se* postconviction petition in which he made claims of ineffective assistance of counsel. Relevant here, defendant alleged that "[a]ppellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing [to] argue that the sentencing statute is [un]constitutional as applied to him." Defendant cited articles finding that the brains of young adults in their early twenties are still maturing, including areas that govern impulsivity and judgment. He alleged that his mandatory life sentence gave the trial court no discretion to consider his age, his minimal criminal history, or his involvement in the crime. Defendant argued that his sentence violated the proportionate penalties clause as applied to him, and he requested a new sentencing hearing where his youth and its characteristics can be considered.

¶ 17    The trial court found that, since defendant was 22.5 years old when the murders occurred, *Miller v. Alabama*, 567 U.S. 460 (2012), did not apply. Citing Justice Burke's concurring opinion in *People v. Harris*, 2018 IL 121932, it also found that defendant was actually making a facial constitutional challenge to the mandatory sentencing statute because he was challenging a mandatory sentence imposed by the statute. See *id.* ¶¶ 70-71 (Burke, J., specially concurring). The

court reasoned that "there can be no constitutional violation by the trial court, where the trial court was legislatively mandated to impose mandatory life sentence" by a constitutional statute. Accordingly, the court found defendant's contentions "meritless" and dismissed his postconviction petition. Defendant filed this appeal.

¶ 18                                   III. ANALYSIS

¶ 19    On appeal, defendant contends that the trial court erred in denying his request for postconviction relief. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a process in which a defendant can claim that his conviction was the result of a substantial denial of his rights under the United States Constitution or the Illinois Constitution or both. *People v. Cathey*, 2012 IL 111746, ¶ 17. The Act provides a three-stage process for non-death-penalty cases. *People v. Jones*, 213 Ill. 2d 498, 503 (2004). To survive summary dismissal at the first stage, defendant need only present the gist of a constitutional claim. *Id.* at 504. The circuit court may summarily dismiss a postconviction petition at this stage if it is frivolous or patently without merit. *Cathey*, 2012 IL 111746, ¶ 17.

¶ 20    A postconviction petition is frivolous or patently without merit if it has no "arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). Courts liberally construe the allegations in the petition, which need only present "a limited amount of detail." *People v. Brown*, 236 Ill. 2d 175, 184 (2010). This " 'low threshold' " requires "only that the petitioner plead sufficient facts to assert an arguably constitutional claim." *Id.* However, a petition alleging "nonfactual and nonspecific assertions that merely amount to conclusions will not survive summary dismissal under the Act." *People v. Morris*, 236 Ill. 2d 345, 354 (2010). We review the summary dismissal of a postconviction petition *de novo*. *Brown*, 236 Ill. 2d at 184.

¶ 21 Defendant was convicted of five counts of first degree murder and one count of armed robbery, and he received a mandatory sentence of natural life in prison pursuant to section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2014). This section provided that "the court shall sentence the defendant to a term of natural life imprisonment when the death penalty is not imposed if the defendant, *** irrespective of the defendant's age at the time of the commission of the offense, is found guilty of murdering more than one victim." *Id.* Defendant argues that, although he was 22 years old when he committed the offense, he was entitled to *Miller*'s protections because studies have shown that his brain, like those of juvenile defendants, is still developing in areas relevant to maturity and moral culpability. He contends that, as a result, his statutorily mandated life sentence is unconstitutional as applied to him where the trial court could not fully consider the characteristics of youth or his personal culpability before sentencing him.

¶ 22 *Miller* recognized that children lack maturity and have an underdeveloped sense of responsibility, are more vulnerable to negative influences, and have character that is not yet well formed. *Miller*, 567 U.S. 471. Not only do these characteristics diminish a child's culpability, but the "distinctive attributes of youth diminish the penological justifications" for imposing life without parole upon children. *Id.* at 472. Thus, "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" violates the eighth amendment because such a scheme, by making the factors of youth "irrelevant to imposition of that harshest prison sentence *** poses too great a risk of disproportionate punishment." *Id.* at 479. To minimize this risk, *Miller* required that before sentencing a juvenile defendant to life in prison without parole, the court must

consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 479-80.

¶ 23    In *Montgomery v. Louisiana*, 577 U.S. 190, 208 (2016), the Court elaborated that the sentencing of a juvenile to life without parole is "excessive for all but the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity' " of youth rather than "irreparable corruption." (Internal quotation marks omitted.) *Id.* Therefore, the judge at a sentencing hearing must consider " 'youth and its attendant characteristics' " so that juveniles who may be sentenced to life without parole can be separated from those who may not. *Id.* at 210.

¶ 24    The Supreme Court, however, "has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *Harris*, 2018 IL 121932, ¶ 58. *Miller*'s decision to draw the line at 18 years old "was not based primarily on scientific research" but instead reflected an imprecise categorical rule that society used to distinguish between children and adults for various purposes. *Id.* ¶ 60. Although an 18-year-old defendant is precluded from raising an eighth amendment claim pursuant to *Miller*, our supreme court determined that such a defendant may raise a postconviction constitutional claim under the proportionate penalties clause. *Id.* ¶ 48 (citing *People v. Thompson*, 2015 IL 118151, ¶ 44).

¶ 25    In his proportionate penalties claim, the defendant in *Harris* alleged that the sentencing scheme resulting in his mandatory *de facto* life sentence, as applied to him, violated the proportionate penalties clause. *Id.* ¶ 36. In support, he argued that the reasoning of *Miller* should

also extend to him as an 18-year-old adult. *Id.* ¶ 37. He contended that, because the record included information about his personal history, the court had sufficient information to consider his claim. *Id.* ¶ 42.

¶ 26    Our supreme court disagreed. It noted that "[a]ll as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *Id.* ¶ 39. Since the defendant was 18 years old when he committed the offenses, the record must contain facts to support his claim that the evolving science of maturity and brain development "applies to defendant's specific facts and circumstances." *Id.* ¶ 46. Defendant raised this issue for the first time on direct appeal, and nothing in the record showed how *Miller* applied to him as an adult. The court found, however, that the defendant's claim may be raised in a postconviction petition because postconviction proceedings are more suited to address constitutional issues based on facts not found in the record. *Id.* ¶ 48. The court did not express an opinion on the merits of the defendant's potential postconviction claim, and it declined to remand the cause for an evidentiary hearing. *Id.*

¶ 27    The question before us, which our supreme court did not consider in *Harris*, is whether defendant's postconviction petition alleged a gist of a constitutional claim that the rationale of *Miller* should be applied to him as a 22-year-old adult. In his petition, defendant claimed that his statutorily mandated life sentence violated the proportionate penalties clause because the trial court could not consider the characteristics of youth before sentencing him to life in prison. As support, he cited articles discussing how the brain does not fully mature until a person reaches his or her mid-twenties. Defendant argues that his allegations presented a gist of a constitutional claim, which is a low threshold.

¶ 28    While a petitioner need only present a limited amount of detail in his petition, that "does not mean that a *pro se* petitioner is excused from providing any factual detail at all surrounding the alleged constitutional deprivation." *People v. Delton*, 227 Ill. 2d 247, 254 (2008). For defendant to make a claim that *Miller* applies to him, he must allege "how the evolving science on juvenile maturity and brain development *** applies to [his] specific facts and circumstances." *Harris*, 2018 IL 121932, ¶ 46. In other words, defendant's claim must allege facts specific to him as a 22-year-old adult and how they rendered him more akin to a juvenile when he committed his offenses. We find *People v. Savage*, 2020 IL App (1st) 173135, instructive.

¶ 29    In *Savage*, a case cited by defendant, the appellate court reversed the dismissal of a 22-year-old defendant's postconviction petition at the first stage. The defendant had alleged that the sentencing court failed to consider his history of drug addiction, in conjunction with his young age, when it sentenced him to 85 years in prison. He stated that he had been a drug addict since he was nine years old and was using drugs every day at the time of the offense. *Id.* ¶ 71. He further alleged that his long-time drug addiction left him more susceptible to peer pressure and rendered him more volatile in " 'emotionally charged settings.' " *Id.* The defendant acknowledged that he was older than 18 years old when he committed the offenses. He argued, however, that his drug addiction and other issues made him the functional equivalent of a juvenile. *Id.* ¶ 60.

¶ 30    The *Savage* court found the defendant's allegations supported by detailed hospital records and the PSI. *Id.* ¶ 72. The record also failed to show that the sentencing court considered the "attributes of young adulthood *** in light of defendant's lifelong drug addiction." *Id.* ¶ 74. The court concluded that, "where defendant's argument finds support in both the filed record and recent case law, it cannot be considered frivolous and patently without merit." *Id.* ¶ 76.

¶ 31    In *Savage*, the defendant argued that a lifelong drug addiction made him more readily influenced by peers and more volatile. As such, his allegations demonstrated how the science of brain development and juvenile maturity applied to his specific circumstances, as *Harris* instructed. Unlike the defendant in *Savage*, defendant here did not allege any facts particular to him that rendered him the functional equivalent of a juvenile. He cited only general articles finding that the brain continues to mature into one's mid-twenties.

¶ 32    Furthermore, the facts in the record do not support defendant's claim that his brain was the functional equivalent of a juvenile's when he committed the offenses. He not only took part in planning the robbery, he instigated it by calling King about where to get some "kush." After meeting with King, defendant told Brown that he had a "sweet lick," or an easy robbery. About an hour later, he called and asked Brown to come to an alley nearby. They loaded the robbery proceeds into the car and drove back to defendant's place. Defendant told them they would split the goods in the morning. Brown subsequently discovered that five people were killed during the robbery and defendant shot two of them. Unlike the case in *Savage*, the record here shows that defendant, who was an adult when the murders occurred, exhibited none of the impulsivity or reckless decision-making associated with juveniles. Rather, he planned and participated in the robbery in which five people were killed.

¶ 33    We further find that defendant's mere reliance on general scientific studies is insufficient to state a gist of a constitutional claim under the Act. Although research has found that the brain continues to develop into a person's mid-twenties, our supreme court recognized that a line must be drawn between adults and juveniles for sentencing purposes, and that line is "not based primarily on scientific research." *Harris*, 2018 IL 121932, ¶ 60. "Rather, determining the age at

which human beings should be held fully responsible for their criminal conduct is ultimately a matter of social policy that rests on the community's moral sense." *Id.* ¶ 77 (Burke, J., specially concurring). The legislature is "better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *People v. Buffer*, 2019 IL 122327, ¶ 35.

¶ 34     Our legislature recently enacted a provision that signals 21 years old as the age of adulthood for accountability and sentencing purposes. Section 5-4.5-115(b) of the Code provides for parole review, "after serving 20 years or more" of their sentence, for defendants who were under the age of 21 when they committed first degree murder. See Pub. Act 100-1182 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-110); Pub. Act 101-288 (eff. Jan. 1, 2020) (renumbering 730 ILCS 5/5-4.5-110 to 730 ILCS 5/5-4.5-115). Furthermore "[i]n considering the factors affecting the release determination ***, the Prisoner Review Board panel shall consider the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration." Pub. Act 101-288 (eff. Jan. 1, 2020) (renumbering 730 ILCS 5/5-4.5-110(j) to 730 ILCS 5/5-4.5-115(j)). This language closely follows *Miller*'s admonitions to courts before sentencing juveniles to life imprisonment. Section 5-4.5-115, however, draws the line at 21 years old. Illinois law also prohibits persons under 21 years of age from purchasing tobacco and alcohol products. See 720 ILCS 675/1 (West Supp. 2019); 235 ILCS 5/6-16 (West 2018).

¶ 35     We cannot say that the legislature's decision to define adulthood as being 21 years old or older shocks the moral sense of the community. Nor can we say that a statute mandating a sentence of life in prison, for an adult who was convicted of murdering more than one person, is so wholly disproportionate to the offense as to shock the moral sense of the community. Accordingly, there

is no basis in the law to support a claim that section 5-8-1(a)(1)(c)(ii) of the Code violates the proportionate penalties clause as to defendant, merely because he was 22 years old when he committed the offenses.

¶ 36    Courts must evaluate a postconviction petition "within the framework of the 'frivolous or *** patently without merit' test." *Hodges*, 234 Ill. 2d at 11 (discussing 725 ILCS 5/122-2.1(a)(2) (West 2006)). A petition that is summarily dismissed as frivolous or patently without merit has no "arguable basis either in law or in fact." *Id.* at 16. In arguing that *Miller* should apply to him as an adult, defendant did not allege any facts particular to his case. Nothing in the record or in defendant's petition supported his allegation that the trial court should have considered him a juvenile when he committed the offenses as an adult. In fact, the calculated and goal-oriented nature of defendant's conduct belied his argument that he acted impulsively due to an immature brain. There is some basis in the law to support that 18- to 20-year-olds are more akin to juveniles than adults, given recent legislative enactments concerning defendants under the age of 21. Defendant, however, falls outside those protections because he was 22 years old when he committed the offenses. Since defendant's postconviction petition has no arguable basis in law or in fact, it was properly dismissed as frivolous or patently without merit. See *id.*

¶ 37                                              IV. CONCLUSION

¶ 38    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 39    Affirmed.


¶ 40    PRESIDING JUSTICE MIKVA, dissenting,

¶ 41    In an initial postconviction petition, Mr. Williams, who was 22 years old at the time of his

crimes, invoked a still-evolving line of cases expanding the protections outlined in *Miller* and its progeny to young adults who can demonstrate that, as applied to them, a natural or *de facto* life sentence violates the proportionate penalties clause of the Illinois Constitution. The majority affirms the circuit court's dismissal of this claim as frivolous, patently without merit, and having no arguable basis in law or fact. I disagree.

¶ 42    In *Thompson* and *Harris*, our supreme court held that young adults are "not necessarily foreclosed from raising" as-applied proportionate penalty challenges to life sentences based on the evolving science on juvenile maturity and brain development. *Harris*, 2018 IL 121932, ¶¶ 46, 48 (citing *Thompson* 2015 IL 118151). The court thus opened the door for a young-adult offender to demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was "cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." See *People v. Klepper*, 234 Ill. 2d 337, 348 (2009) (stating what is required to succeed on a proportionate penalties claim). In so holding, the court established no maximum age at which such claims could be cognizable.

¶ 43    Citing with approval this court's decision in *Savage*, 2020 IL App (1st) 173135, ¶ 80, the majority in this case agrees that it is possible for a 22-year-old offender to state the gist of an as-applied sentencing challenge seeking *Miller*'s protections. *Supra* ¶¶ 28-29. The majority distinguishes that case from this one, however, on the basis that the defendant in *Savage* alleged in his postconviction petition that a lifelong drug addiction had made him volatile and more susceptible to peer pressure, characteristics associated with juvenile offenders. *Supra* ¶¶ 29-31 (citing *Savage*, 2020 IL App (1st) 173135, ¶¶ 71-76). Mr. Williams has made no similar

allegations.

¶ 44 I do not believe that this, on its own, should prevent his petition from advancing to the second stage. "To be summarily dismissed at the first stage as frivolous or patently without merit, [a] petition must have *no arguable basis either in law or in fact*, relying instead on an indisputably meritless legal theory or a fanciful factual allegation." (Emphasis added and internal quotation marks omitted.) *People v. Boykins*, 2017 IL 121365, ¶ 9. To attain the very low threshold necessary for advancement to the second stage, a petitioner "need not set forth [a] claim in its entirety" and "need only present a limited amount of detail." (Internal quotation marks omitted.) *People v. Edwards*, 197 Ill. 2d 239, 244 (2001).

¶ 45 In the past, this court occasionally held that a postconviction petitioner was required to include facts supporting each element of a constitutional violation. *Id.* at 244. This is a standard our supreme court unequivocally rejected in *Edwards*. *Id.* at 244-45. Requiring this type of "full or complete pleading" was, the court explained, not only contrary to its holding that a *pro se* defendant need present only a limited amount of detail to survive summary dismissal but also "at odds with the 'gist' standard itself since, by definition, a 'gist' of a claim is something less than a completely pled or fully stated claim." *Id.* at 245. It is unreasonable to expect a petition to contain facts that, if proved, would establish each element of a constitutional violation because a *pro se* petitioner will "in all likelihood, be unaware of the precise legal basis for his claim or all the legal elements of that claim." *Id.* And in many cases, he will also "be unaware that certain facts, which in his mind are tangential or secondary, are, in fact, critical parts of a complete and valid constitutional claim." *Id.* In the court's view, requiring a *pro se* defendant to "recognize the facts that need to be pled to support a 'valid claim' " was "an unrealistic requirement." *Id.*

¶ 46    I find these concerns particularly applicable here, where Mr. Williams faced a statutorily mandated natural life sentence. Given the certainty of the sentence he faced, Mr. Williams declined to participate in the preparation of a presentence investigation report or offer the court a statement in allocution. His counsel likewise waived all arguments in mitigation. As a result, the record in this case is devoid of any facts concerning Mr. Williams's particular circumstances. Nor is there any indication that Mr. Williams discussed with his counsel or understood the sorts of facts that, in cases where a life sentence is not certain, might be established and offered in mitigation or might suggest, as in *Savage*, that drugs or mental health issues lowered the defendant's functional age. See *Savage*, 2020 IL App (1st) 173135, ¶¶ 70-74.

¶ 47    I believe Mr. Williams has stated the gist of a constitutional violation. His argument—that as applied to him the statute mandating that he receive a natural life sentence violates the proportionate penalties clause of the Illinois Constitution—has an arguable basis in law and is not positively contradicted by the record in this case. Whether, with the assistance of postconviction counsel, he can marshal the facts necessary to make a substantial showing in support of that claim is a consideration that must be reserved for second-stage proceedings. See *Edwards*, 197 Ill. 2d at 245-46 (setting out the function and purpose of second-stage proceedings). The majority's holding that he must do so now, on this record, as a *pro se* petitioner, is in my view contrary to our supreme court's guidance on such matters.

¶ 48    I would reverse the circuit court's summary dismissal of Mr. Williams's postconviction petition and remand for second-stage proceedings.

¶ 49    I respectfully dissent.

No. 1-19-0535

| | |
|---|---|
| **Cite as:** | *People v. Williams*, 2021 IL App (1st) 190535 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 08-CR-15108; the Hon. Carol M. Howard, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Ashlee Johnson, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Sara McGann, Assistant State's Attorneys, of counsel), for the People. |